(173 App. Div. 159)

### T. A. GILLESPIE CO. v. H. S. KERBAUGH, Inc.

(Supreme Court, Appellate Division, First Department.   June 16, 1916.)

1. CANALS ⟨⟩15—INJURY FROM CONSTRUCTION—SUFFICIENCY OF EVIDENCE.

In an action by a canal contractor, who was engaged in dry excavating and in hydraulic dredging upon a lower level, for damages from washing away the dam which protected his dry work, the flooding of the work, the damage to the machinery, tracks, etc., and the subsequent increase in the expense of operation, evidence *held* to show that such damage was due to the defendant's act in opening the paddles of a dam which had been built by it to hold the water in an upper part of the canal where it was dredging.

[Ed. Note.—For other cases, see Canals, Cent. Dig. §§ 15, 16, 18, 19; Dec. Dig. ⟨⟩15.]

2. CANALS ⟨⟩15—INJURY FROM CONSTRUCTION—LIABILITY.

The act of a canal contractor engaged in hydraulic dredging on an upper part of the canal in partly opening a dam which it had built to retain water exclusively for its own use, during a heavy rain and to save the work, and casting the burden of extra water upon the contractors below, was a deliberate trespass, for which it was liable.

[Ed. Note.—For other cases, see Canals, Cent. Dig. §§ 15, 16, 18, 19; Dec. Dig. ⟨⟩15.]

3. PRINCIPAL AND AGENT ⟨⟩159(1)—AUTHORITY OF AGENT—CANAL CONSTRUCTION.

The act of a superintendent in charge of the defendant contractor's canal construction work on an upper part of the canal in partly opening a dam exclusively used to keep water in defendant's section, to avoid injury to the work during a heavy rain, was within the scope of his authority.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 600; Dec. Dig. ⟨⟩159(1).]

4. CANALS ⟨⟩15—INJURY FROM CONSTRUCTION—VIS MAJOR—PRESUMPTION.

In such case, and in the absence of any evidence to the contrary, the jury might assume that the dams below would have held if the additional burden of water had not been imposed by the act of defendant's agent.

[Ed. Note.—For other cases, see Canals, Cent. Dig. §§ 15, 16, 18, 19; Dec. Dig. ⟨⟩15.]

Appeal from Trial Term, New York County.

Action by the T. A. Gillespie Company against H. S. Kerbaugh, Incorporated.   From a judgment entered in favor of the plaintiff upon a verdict of a jury, and from an order denying the defendant's motion for a new trial it appeals.   Judgment and order affirmed.

Argued before CLARKE, P. J., and McLAUGHLIN, DOWLING, SMITH, and PAGE, JJ.

James D. Andrews, of New York City, for appellant.
Joseph M. Hartfield, of New York City, for respondent.

PAGE, J.   The plaintiff and defendant were both contractors engaged in the construction of different portions of the new state Barge Canal.   The defendant was doing hydraulic dredging in an upper portion of the canal, above and to the west of a lock of the old Erie Canal known as "Lock 61."   The plaintiff was performing some dry excavating upon the level immediately east of lock 61, between locks

61 and 29, and was also performing hydraulic dredging upon the lower level east of lock 29. There were two dams between plaintiff's dry work and lock 61, one of which was erected by the plaintiff to protect its work and the other erected by Fitzgerald and Caldwell, another contractor. Above these said two dams was an emergency cut which drained into Garnagua creek, a natural water course which ran south of the canal and flowed into it east of lock 29.

It appears that it was customary to drain all the water out of the canal late in the fall of the year and keep it in that condition during the winter; but the defendant applied to the state engineering department and received permission to keep eight feet of water in the portion west of lock 61 for the purpose of using the water for hydraulic work. This section naturally drained to the west of lock 61 through the Fairport waste weir, but the western end had been dammed up by the defendant to hold the water in.

On January 6, 1913, extra heavy rains occurred in this section, which, with the melting snow, caused the water in the canal and all the surrounding creeks to rise rapidly. On that night defendant's general superintendent at the works, Mr. Kohler, applied to the deputy superintendent of public works to order the lock opened, and on his refusal directed the lock tender to open two of the paddles of lock 61 so as to relieve the pressure. These paddles were both left open for several hours after which one was closed and the other was partly closed, but because of refuse and driftwood which had become lodged in it defendant's employés were unable to close it until 6 o'clock the next morning.

Following the influx of water from the lock 61, caused by defendant's opening the paddles, both the Fitzgerald and Caldwell dam and the plaintiff's dam, mentioned above, which protected plaintiff's dry work, were washed away, the work was flooded, serious damage done to machinery and tracks, and the subsequent expense of working increased because of the deposit of water. This water, so released by the breaking of the dams, also flowed through lock 29 to the lower level, and, plaintiff claims, caused serious damage to this portion of the work east of lock 29 by washing out the embankments. The plaintiff's claim with respect to the exact cause of this damage is as follows: Below lock 29 it was maintaining a depth of water of eight feet, taking the natural flow of Ganargua creek, which entered the canal just east of lock 29, and regulating the depth of the water by means of sluice gates through Harrison's spillway (3½ miles east of lock 29). When the water came rushing through lock 29 down on this lower level, it raised that level about 3 feet, and, joining with the water from Ganargua creek, formed a heavy current, which washed out the embankment used by the plaintiff for its dredging work.

The defendant has attempted in its brief to show that the damage to this lower level was done principally by the increase in the flow from Ganargua creek, and that the extra 3,000,000 gallons per hour which was cast upon the level added only about one-twelfth to the volume. In support of this theory the defendant relies principally upon the testimony of Clarence F. Fisher, an expert engineer, who

explained by means of the state records that the total flow from Gan-argua creek increased 37,000,000 gallons per hour from 1 o'clock on January 6th to 1 o'clock on the 7th. It is difficult to follow the testimony of this witness, since it is apparently based upon figures made off the record from data which are not furnished us, and by means of a formula which only an engineer could understand. He also does not appear to have considered the fact that by the breaking of the Fitzgerald and Caldwell dam and the plaintiff's dam the defendant let down all the water confined by those dams, in addition to the 3,000,000 gallons per hour which came from lock 61. The witness did state, however, that at 1 o'clock on the 7th, when Ganargua creek reached its greatest rise, it was only 1.3 feet higher than at 1 o'clock on the previous day, before the flood began.

The only eyewitness to the flood, plaintiff's witness Coffey, testified that the lower level raised during the night of the 6th–7th from 3 to 3½ feet. As the banks were 2 feet above the 8 foot level, the 1.3 feet rise in the water caused by Ganargua creek would not alone have overflowed them, and the jury were entitled from this evidence to find that the cause of the overflow and erosion was the sudden downpour of the water formerly restrained by the two upper dams, plus 3,000,000 gallons per hour from lock 61, all of which raced through lock 29 to the lower level. There is, furthermore, nothing in the evidence to show that, without this additional burden, the plaintiff would not have successfully carried off the extra water caused by the swelling of Ganargua creek through its sluice gates at Harrison's spillway. Therefore, without considering the fact that Ganargua creek itself was somewhat enlarged by the water thrown into it above lock 29 through the Fitzgerald and Caldwell cut, which was also attributed to the opening of lock 61, I think the evidence sufficiently showed that the damage on the lower level was due to the defendant's act.

The appellant lays some stress upon the testimony of its witness Littell to the effect that the break in the bank on the lower level was probably caused by the flow from Ganargua creek. It must be noted, however, that Littell did not see the break, and that he assumed it was opposite the junction of Ganargua creek with the canal, whereas Coffey testified that the break was about 18,000 feet east of that point.

[1, 2] The case resolves itself, therefore, into the simple question of law whether the defendant's act of opening the lock makes it liable for the damage flowing therefrom. In this connection it appears that the water held in by lock 61 was kept there exclusively for defendant's use, and would otherwise have been drained off in the fall. It naturally drained to the westward, but was prevented from so doing by a dam erected at the western outlet by the defendant. Instead of breaking his own dam, and letting the water run out through its natural channel, the defendant's superintendent, fearing that it would flood the banks, deliberately opened the gates and cast the burden of the defendant's extra water upon the neighboring contractors below. Whatever the motives of the superintendent may have been, the act was a deliberate trespass, for which the defendant must answer in damages.

[3] I do not think there is any merit in the appellant's claim that

the act was not within the scope of Kohler's (the superintendent's) authority. Kohler was in charge of the work as defendant's alter ego. The water was there for defendant's purposes exclusively. Whatever Kohler did in manipulating it was chargeable to the defendant.

[4] As to defendant's claim that the damages were the result of a "vis major," there is no evidence to show that without the intervention of defendant's act *any damage whatever* would have been sustained by the plaintiff. It is possible that damage might have been done, but there is no way that question can be answered. In the absence of some evidence to the contrary, the jury were entitled to assume that the dams might have held if the additional strain had not been imposed. To cast upon the plaintiff the burden of affirmatively establishing this fact beyond peradventure would be to require an impossibility. All the facts having been shown, it was a question for the jury to determine as reasonable men, and this they did.

The judgment and order appealed from should therefore be affirmed, with costs. Order filed. All concur.